894 P.2d 386

Esperio TORRES, personal representative of the Estate of Armando Torres, deceased, and John Beeks, personal representative of the Estate of Jeren Beeks, deceased, Plaintiffs–Petitioners,

v.

STATE of New Mexico, New Mexico Department of Public Safety, City of Albuquerque, Albuquerque Police Department, Robert Vanderhee, Ruth Lowe, and Sam Baca, Defendants–Respondents.

No. 21535.

Supreme Court of New Mexico.

March 23, 1995.

Cynthia A. Fry, Branch Law Firm, Arthur M. Solon, Brian K. Branch, Albuquerque, for petitioners.

Paul M. Schneider, Santa Fe, Robert M. White, City Atty., Judy K. Kelley, Asst. City Atty., Albuquerque, for respondents.

## OPINION

RANSOM, Justice.

We issued a writ of certiorari to the Court of Appeals to review ·that Court's opinion in *Torres v. State,* 116 N.M. 379, 862 P.2d 1238 (Ct.App.), *cert. granted,* 117 N.M. 802, 877 P.2d 1105 (1993), in which the Court of Appeals affirmed the dismissal of a complaint brought by Esperio Torres and John Beeks

as personal representatives of the estates of their adult sons. Torres and Beeks sought wrongful-death damages against the Albuquerque Police Department and others under the New Mexico Tort Claims Act, NMSA 1978, §§ 41–4–1 to –27 (Repl.Pamp.1989 & Cum.Supp.1994). The district court dismissed the action for failure to state a claim upon which relief could be granted. Accepting as true all facts well pleaded, *see Jones v. International Union of Operating Eng'rs,* 72 N.M. 322, 325, 383 P.2d 571, 573 (1963), we reverse.

*Facts and proceedings.* On the morning of November 29, 1988, a gunman entered an Albuquerque bagel shop and killed three people. Witnesses described the gunman to the Albuquerque Police Department ("APD"), and the description appeared in the news media later that day. Albuquerque Mayor Ken Schultz instructed Chief of Police Sam Baca to put as many officers as needed on the investigation and authorized all overtime needed to arrest the murderer. In an effort to prevent the gunman from leaving town, APD informed the media that officers were guarding the airport, train depot, and bus station.

On the afternoon of November 29 an employee at an Albuquerque gun shop telephoned the New Mexico Department of Public Safety ("DPS") and spoke with Officer Robert Vanderhee. The employee informed Vanderhee that a man by the name of Nathan Trupp matched the description of the gunman and that Trupp had purchased a handgun on November 28. The employee gave Trupp's address to Vanderhee. Vanderhee attempted to reach his liaison at APD, Sergeant Desi Garcia, but Garcia was not in. He then tried to reach Officer Ruth Lowe, who was in charge of the investigation, but Lowe had left for the day. Vanderhee left a message for Lowe and went home without following up on the information he had received. Lowe received Vanderhee's message on the evening of November 29 but was unable to reach him at his office.

At 8:30 the next morning (November 30) Vanderhee reached either Garcia or Lowe and relayed the information he had received. That same morning a taxi driver informed Lowe and Vanderhee that, on November 28, he had driven Trupp to several Albuquerque gun shops and then to do target shooting. The taxi driver gave Lowe and Vanderhee a description of Trupp, Trupp's address, and a summary of Trupp's activities, including the purchase of the handgun. The driver believed Trupp was mentally unstable.

At approximately 10:15 that morning APD sent officers to Trupp's apartment complex. The officers observed the complex until approximately 1:30, at which time they forcibly entered Trupp's apartment. Trupp was not in his apartment and could not be located. Fearing that Trupp would flee, APD stationed police officers at the airport, train depot, and bus station.

A subsequent investigation revealed that Trupp had committed the murders in the bagel shop. Trupp spent the night of November 29 in his apartment and stayed there until approximately 9:00 the next morning, at which time he paid his rent. After paying rent, Trupp went to the bus station and boarded a 12:30 bus for Los Angeles. He arrived in Los Angeles on December 1. At approximately 6:45 that evening Trupp shot and killed Armando Torres and Jeren Beeks, who were both security guards at Universal Studios. Trupp used the same handgun that was used in the bagel-shop murders.

On November 29, 1990, Esperio Torres and John Beeks filed an action under the Tort Claims Act. In addition to the facts set out above, the complaint alleged that Trupp was delusional and hearing non-existent voices from November 28 to December 1. The complaint also alleged that APD did not request an interstate warrant for Trupp nor did it ask the Federal Bureau of Investigation to become involved in the search. Finally, the complaint alleged that APD failed to notify out-of-state law enforcement authorities of the murders or of Trupp's unknown whereabouts. According to Torres and Beeks, these failures amounted to a breach by APD and DPS of their statutory duty to investigate and their common-law duty to exercise—for the safety of others foreseeably at risk from assault by the same gunman— that care ordinarily exercised by reasonably prudent and qualified officers in light of the

nature of the crime and the urgency of the investigation. They argue that such breaches proximately caused the deaths of their sons.

On April 8, 1991, the district court dismissed with prejudice the complaint, holding that "as a matter of law, the injured parties were not foreseeable plaintiffs and the defendants owed no duty to plaintiffs." The Court of Appeals affirmed.

*Policy reasons advanced by the Court of Appeals are not determinative.* The Court of Appeals held that as a matter of policy the duty to investigate and the duty to exercise ordinary care should not be extended to the victims in this case because it would be "unrealistic in light of rising criminal activity and limited public resources." 116 N.M. at 384, 862 P.2d at 1243.[1] Although "rising criminal activity" and "limited public resources" may be factors for the jury to consider in determining whether APD or DPS breached its duties, we do note that Mayor Schultz here ordered Police Chief Baca to put as many officers as needed on the case, authorizing as much overtime as needed to apprehend the killer; and while these factors may bear upon the discharge of duty, they do not bear upon the existence of the statutory duty of law enforcement officers to investigate crimes.

■ Policy determines duty. With deference always to constitutional principles, it is the particular domain of the legislature, as the voice of the people, to make public policy. Elected executive officials and executive agencies also make policy, to a lesser extent, as authorized by the constitution or the legislature. The judiciary, however, is not as directly and politically responsible to the people as are the legislative and executive branches of government. Courts should make policy in order to determine duty only when the body politic has not spoken and only with the understanding that any misper-

ception of the public mind may be corrected shortly by the legislature.

■ What is the existing public policy with respect to governmental liability for the acts or omissions of law enforcement officers? The legislature specifically has waived immunity from liability under "traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." Section 41–4–2(B). This waiver of immunity applies to actions for wrongful death from battery "caused by law enforcement officers while acting within the scope of their duties." Section 41–4–12; *Methola v. County of Eddy,* 95 N.M. 329, 333, 622 P.2d 234, 238 (1980) (holding that under Section 41–4–12 officer's negligence may proximately "cause" battery by third person against another); *Blea v. City of Española,* 117 N.M. 217, 221, 870 P.2d 755, 759 (Ct.App.) (holding battery committed by intoxicated driver gave rise to action against law enforcement officers claimed to have been negligent in failing to detain driver earlier), *cert. denied,* 117 N.M. 328, 871 P.2d 984 (1994); *Ortiz v. New Mexico State Police,* 112 N.M. 249, 252, 814 P.2d 117, 120 (Ct.App.1991) (holding law enforcement officers liable when negligent supervision and training of subordinates leads to battery), *cert. quashed,* 113 N.M. 352, 826 P.2d 573 (1992). With NMSA 1978, Section 29–1–1 (Repl.Pamp.1994), the legislature has imposed on law enforcement officers a duty to investigate crimes called to their attention, and an action for injuries proximately caused by an officer's negligent breach of this duty is within the contemplation of Section 41–4–12. *Schear v. Board of County Comm'rs.,* 101 N.M. 671, 676, 687 P.2d 728, 733 (1984); *see California First Bank v. State,* 111 N.M. 64, 801 P.2d 646 (1990) (recognizing private cause of action under Section 41–4–12 when law enforcement officer's negligent failure to discharge duties under Section 29–1–1 results in personal injury).

---

1. Although in one passage from *Torres,* 116 N.M. at 383, 862 P.2d at 1242, it is not clear whether the author was discussing "duty" or "breach of duty," in *Blea v. City of Española,* 117 N.M. 217, 221, 870 P.2d 755, 759 (Ct.App.), *cert. denied,* 117 N.M. 328, 871 P.2d 984 (1994), the Court of Appeals specifically stated, "The gist of the complaint in [*Torres*] was that there was a duty for the police to have taken faster action, and this Court held that it would be unreasonable to find a statutory or common-law duty to promptly investigate and solve every reported homicide."

■ In this case the Court of Appeals has formulated public policy by which it restricts the statutory duty of law enforcement officers. It is not necessary, however, for the courts to formulate policy in order to apply the law to this case. Because the trial court dismissed the complaint for failure to state a claim, we need only recognize the statutory duty and examine the complaint for any set of facts provable under the claim that may show breach under traditional tort concepts of ordinary care required for the safety of persons foreseeably at risk. *See California First Bank,* 111 N.M. at 66, 801 P.2d at 648.

*We apply New Mexico tort law in this case.* Although neither party argued that the district court applied the wrong law, we feel it necessary to review which state's law applies in this case because the deaths occurred in California. In determining this issue, this Court generally follows the doctrine of *lex loci delicti* and applies the law of the state in which the wrongful conduct occurred. *See Zamora v. Smalley,* 68 N.M. 45, 47, 358 P.2d 362, 363 (1961) (stating that because accident occurred in Colorado, the law of that state applied); *First Nat'l Bank in Albuquerque v. Benson,* 89 N.M. 481, 481–82, 553 P.2d 1288, 1288–89 (Ct.App.) (applying *Zamora*), *cert. denied,* 90 N.M. 7, 558 P.2d 619 (1976). The "place of the wrong" under this rule is "the location of the last act necessary to complete the injury." *Wittkowski v. State,* 103 N.M. 526, 528, 710 P.2d 93, 95 (Ct.App.), *cert. quashed,* 103 N.M. 446, 708 P.2d 1047 (1985), *overruled on other grounds by Silva v. State,* 106 N.M. 472, 477, 745 P.2d 380, 385 (1987). This rule is not utilized, however, if such application would violate New Mexico public policy. *Id.*

■ In this case the shooting in California was the "last act necessary to complete the injury," and one could argue that this Court should apply California law. This is not, however, an action against Trupp for the murder; it is an action against various defendants for failure to investigate a crime in New Mexico and for failure to exercise ordinary care to prevent Trupp from leaving New Mexico. As stated in *Wittkowski,* the duties of law enforcement personnel are defined by the Tort Claims Act and by decision-al law. *Id.* Thus "[p]ublic policy dictates that New Mexico law determine the existence of duties and immunities on the part of New Mexico officials." *Id.* at 529, 710 P.2d at 96.

■ *The issue of foreseeability is a question for the jury.* The district court determined that the victims in this case were not foreseeable, and thus APD and DPS did not owe them a duty. Foreseeability is a question of law when a court, in reviewing whether a duty exists, can determine that the victim was unforeseeable to any reasonable mind. *Calkins v. Cox Estates,* 110 N.M. 59, 61–62, 792 P.2d 36, 38–39 (1990); *Palsgraf v. Long Island R.R.,* 248 N.Y. 339, 162 N.E. 99, 100 (1928) (holding that a court cannot impose a tort duty in relation to another person absent foreseeability); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 43, at 284–85 (5th ed. 1984). In light of its holding that as a matter of policy APD and DPS did not owe a duty to the victims, the Court of Appeals did not address the issue of foreseeability. We believe that the trial court erred in finding that, as a matter of law, the victims were not foreseeable.

APD and DPS argue that the victims were so removed from the alleged wrongful conduct that they were unforeseeable as a matter of law. In particular, APD argues that a victim is not foreseeable unless he or she is in imminent danger, citing for support *Schear,* 101 N.M. at 676, 687 P.2d at 733, and *California First Bank,* 111 N.M. at 71–75, 801 P.2d at 653–57. In *Schear* the plaintiff was the victim of a crime that the police knew to be taking place. There was a foreseeable risk of injury if the officers did not respond to the call for help. In *California First Bank* the victims were members of the traveling public and there was a foreseeable risk of injury "to the traveling public in the event sheriff deputies failed to apprehend [a drunk driver] after they knew of his dangerously intoxicated condition." 111 N.M. at 74 n. 7, 801 P.2d at 656 n. 7.

■ In point of fact, neither *Schear* nor *California First Bank* discuss foreseeability in terms of imminent danger. Although in both cases the victims were injured either

concurrently with or immediately after the alleged act of negligence, this Court did not base the scope of the officers' duty on considerations of time and place. As discussed later in this opinion, the legislature has enunciated no policy that gives rise to arbitrary time and place restrictions on the duty of law enforcement officers. Traditionally, time and place factors are left to the jury in its determination of proximate cause and breach of duty. *See* Keeton et al. § 43, at 283 ("[W]hen causation is found, and other factors are eliminated, it is not easy to discover any merit whatever in the contention that . . . physical remoteness [of time or space] should of itself bar recovery.").

■ DPS further tries to distinguish this case from *California First Bank* by arguing that there the police knew the identity and condition of the criminal. The knowledge of the identity and condition of the criminal, however, is not determinative in defining duty. In *Schear* the police were told only that an armed intruder had entered a house and refused to allow the victim to leave. The police did not know the identity of the intruder and did not know of the criminal's physical or mental condition, other than knowing that he was armed. Despite this, we held that the police had a duty to the victim. 101 N.M. at 676, 687 P.2d at 733. Thus, foreseeability does not turn on the officer's knowledge of the true identity or condition of the criminal if there is a possible risk of injury to some victim and the officer knows of that risk.

■ The amended complaint has stated a set of facts under which Torres and Beeks might prevail on the issue of foreseeability. It is not unlikely that a murderer would flee the city in which he committed the crime and, given modern-day transportation, that this person would flee across state lines. Further, the police knew or should have known that it is possible that a person who kills randomly with no motive would kill again; it is the very irrationality of the random killing that portends danger to others. The harm in this case was not so removed from the conduct of the Defendants that we may say as a matter of law that the victims were unforeseeable. Thus foreseeability is a question for the jury to determine by giving

thought to, among other things, the time, space, and distance between the alleged failure to investigate and the deaths of the two security guards. *See Calkins,* 110 N.M. at 66, 792 P.2d at 43.

■ *APD and DPS officers have a duty to exercise that care ordinarily exercised by reasonably prudent officers in similar circumstances.—Duty to investigate.* In *Schear,* 101 N.M. at 676, 687 P.2d at 733, and *California First Bank,* 111 N.M. at 71–75, 801 P.2d at 653–57, this Court established that law enforcement officers are liable for harm caused by the negligent performance of their statutory duty to investigate crimes. In this case Torres and Beeks allege that the officers failed to investigate the bagel-shop murders in a reasonable fashion. As we said in *Cross v. City of Clovis,* 107 N.M. 251, 254, 755 P.2d 589, 592 (1988),

a failure to act, to be negligent, must be a failure to do an act which a reasonably prudent and qualified law enforcement officer, in the exercise of ordinary care, would do in order to prevent injury to a person whom the officer would foresee to be exposed to risk of injury.

Thus the officers had a duty to exercise that care ordinarily exercised by reasonably prudent and qualified law enforcement officers as they investigated the murders.

*—Persons for whose benefit or protection the statutory duty of investigation is intended.* APD and DPS argue that, aside from the foreseeability issue discussed above, the duty of law enforcement officers extends only to known victims of a crime in progress or specific segments of the public in imminent danger and, then, only for the benefit of persons within the political boundaries of New Mexico. In essence, APD and DPS argue that the victims in this case were not within the class of persons to be protected by the statutory duty to investigate.

■ In *Schear* this Court held that officers may be liable for their failure to investigate when they know the identity of the victim of a crime in progress. 101 N.M. at 676, 687 P.2d at 733. Similarly, in *California First Bank* we held that law enforcement officers may be liable for failure to arrest a

drunken driver because their omission places a specific segment of the population (the traveling public) in imminent danger. 111 N.M. at 75, 801 P.2d at 657. In both cases this Court extended the duty of law enforcement officers to foreseeable victims; neither case specifically limited their duty to identified victims or a specific segment of the population imminently at risk. *See California First Bank,* 111 N.M. at 74 n. 7, 801 P.2d at 656 n. 7 (stating that liability rested upon foreseeability of the victims and not specific knowledge of investigating police). As the Court of Appeals correctly stated in *Wittkowski,* the statutory duty to investigate "is for the benefit and protection of the public." 103 N.M. at 531, 710 P.2d at 98. In creating the duty, the legislature did not limit the traditional tort concept of foreseeability that would otherwise define the intended beneficiaries of the statute. All persons who are foreseeably at risk within the general population are within the class of persons to be protected by the duty to investigate. *See* Keeton et al. § 36, at 224 ("The class of persons to be protected ... extend[s] to all those likely to be injured by the violation [of the statute].").

As to the argument regarding political boundaries, the Court of Appeals rejected this contention, stating that "the scope of [a] duty is determined by the foreseeability of the injury, and not by reference to geographical boundaries." *Torres,* 116 N.M. at 383, 862 P.2d at 1242. We agree because, although the class of persons the legislature sought to protect is not stated explicitly, to limit the class to those within the state would lead to illogical results. We interpret statutes to avoid implied limitations that are not warranted by sound reason. *Cf. Sandoval v. Rodriguez,* 77 N.M. 160, 163, 420 P.2d 308, 310 (1966) (stating that legislative enactments "must be interpreted to accord with common sense and reason"). If we were to hold that the duty to investigate was limited by state boundaries, we must infer that the legislature intended to discriminate against foreseeable victims a stone's throw across the border in favor of foreseeable victims 300 miles across the state. We need not address whether the legislature could thus classify persons intended to be benefit-ted by the statute. There is no reason to believe that they did so. *Cf. Udy v. Calvary Corp.,* 162 Ariz. 7, 780 P.2d 1055, 1059 (Ct. App.1989) (holding landlord had duty to protect tenant from injury that occurred off landlord's premise and rejecting notion that "geographic limits ... necessarily delimit the scope of any duty of care imposed upon the parties to [a] relationship").

When the duty to investigate is breached and the wrongdoer is not apprehended, the risk of injury may extend to a known individual, as in *Schear,* or to a class of individuals, as in *California First Bank.* In most circumstances, however, the identity of potential victims will not be known to the investigating officers. Because it is now as easy to travel from Albuquerque to Los Angeles as it is to travel from Albuquerque to Las Cruces, New Mexico, the statutory duty to investigate logically must extend to benefit or protect all foreseeable victims, including those persons outside the state. *E.g.,* Keeton et al. § 36, at 227 ("[I]n the absence of any other guide, a statute may well be assumed to include all risks that reasonably may be anticipated as likely to follow from its violation."). If the owner of a motor vehicle learns that a permitted driver is incompetent or even a madman (as here) with the most reckless and wanton propensities behind the wheel, it hardly could be argued that proportional liability of the owner for taking inadequate steps to intervene would attach only to specifically identifiable victims of highway mayhem or within some geographic boundary.

Based on *Schear* and *California First Bank,* we hold that when any person "of the public" (regardless of geographic location) is foreseeably at risk of injury by a party reported to be in violation of the criminal law, officers undertaking an investigation of the crime owe that person a duty to exercise the care ordinarily exercised by prudent and qualified officers. Although APD and DPS did investigate and attempt to apprehend Trupp in this case, the question whether the investigation and attempt to apprehend was reasonable and done with due care is to be decided by the factfinder, keeping in

mind that "[a]s the risk of danger that reasonably should be foreseen increases, the amount of care required also increases." *Cross,* 107 N.M. at 254, 755 P.2d at 592.

*The conduct of APD and DPS must be compared to the conduct of Trupp.* The trial court should be aware of our recent holdings in *Reichert v. Atler,* 117 N.M. 623, 875 P.2d 379 (1994), and *Barth v. Coleman,* 118 N.M. 1, 878 P.2d 319 (1994), in which we analyzed our comparative-liability jurisprudence. In those cases we reaffirmed that bar owners or operators could be held liable for breaching their duty to protect patrons from foreseeable harm and held that the negligent conduct of the owner or operator could be compared to the conduct of the third party who was actually responsible for the injury. This case is similar in that if a jury finds that APD and DPS have breached their duty to investigate and their duty to exercise ordinary care, it must compare that breach with Trupp's conduct in determining liability.

*Conclusion.* We hold that police officers have a statutory duty to investigate and a common-law duty to exercise, for the safety of others foreseeably at risk, that care ordinarily exercised by reasonably prudent and qualified officers. Because foreseeability, breach, proximate cause, and comparative liability are questions for the jury, we reverse the district court and Court of Appeals and remand this case for proceedings consistent with this opinion.

IT IS SO ORDERED.

FRANCHINI and MINZNER, JJ., concur.